IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SALLY ELSTAD, LEANN RYAN and ROSEMARY SYLVESTER, | ) ) ) | |
| Plaintiffs, | ) ) | Judge Ronald A. Guzmán |
| v. | ) ) | 04 C 2946 |
| SOS CHILDREN'S VILLAGES ILLINOIS, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Sally Elstad, LeAnn Ryan and Rosemary Sylvester have sued Defendant SOS Children's Villages Illinois ("SOS") for its alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and state law.[1] The case is before the Court on SOS' motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons provided in this Memorandum Opinion and Order, the Court grants the motion in part and denies it in part.

## Facts[2]

SOS is a not-for-profit child welfare agency with facilities in Lockport and Chicago, Illinois. (Def.'s LR 56.1(a) Stmt. ¶ 3.) SOS operates homes for foster parents and children. (*Id.*

---

[1] On March 22, 2005, plaintiffs voluntarily dismissed the following claims: Elstad and Ryan's Count I claims that they were terminated because of their race and gender, Sylvester's Count I claim that she was terminated because of her race and Sylvester's Count III and IV claims that she was paid less than a similarly situated, younger male.

[2] Unless otherwise noted, the following facts are undisputed.

¶ 4.) The Illinois Department of Children and Family Services ("DCFS") is SOS' primary source of funding. (*Id.* ¶ 3.)

During plaintiffs' tenure with SOS, Job West ("West") was SOS' Chief Executive Offer ("CEO"). (*Id.* ¶ 8.) Brian Barclay ("Barclay") was the Lockport Village Director and he reported to West. (*Id.* ¶ 9.) Joseph Skender ("Skender") was president of the SOS board of directors. (*Id.* ¶ 10.)

Throughout plaintiffs' employment, the agency had a progressive discipline policy in place. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 175, 177-78.) The policy provided four levels of discipline: verbal warning, written warning, probation/suspension, termination. (App. Pls.' LR 56.1(b) Stmt., Vol. II, Tab U, PX 65 at 28.) The policy said, however, that "[a]ny of the . . . steps in the discipline process may be omitted." (*Id.*) It also said that insubordination, which it defined as "refusal to carry out the duties of one's assigned position; refusal to follow agency policies or procedures; refusal to comply with the directives of the immediate supervisor," could result in immediate termination. (*Id.* at 29-30.)

From June 30, 2002 until her termination on May 21, 2003, plaintiff Elstad worked at SOS as Development Director of the Lockport facility and reported to West. (Def.'s LR 56.1(a) Stmt. ¶¶ 5, 12.) In that position, Elstad was responsible for raising some of the money SOS needed to meet its annual budget. (*Id.* ¶ 17.)

Skender contends that he was dissatisfied with Elstad's fund-raising as early as December 2002. (*Id.* ¶ 33.) He says he expressed his concerns to Elstad, an assertion she denies. (*Id.* ¶ 39; Pls.' LR 56.1(b)(3)(A) Stmt ¶ 39.) Regardless of Skender's feelings, it is undisputed that West gave Elstad a rating of 4.4, out of a possible five points, for her fund-

raising efforts in his January 2003 evaluation of her. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 162; App. Pls.' LR 56.1(b) Stmt., Vol. II, Tab U, PX 1.) In addition, he said: "A superb job so far – with a high degree of frustration involved in creating a Development Department that meets its goals and expectations. There is much to do – I am confident she can do it." (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 166; App. Pls.' LR 56.1(b) Stmt., Vol. II, Tab U, PX 1.)

Sometime in March 2003, Elstad received a list of performance objectives for March 2003-March 2004 for her department. (Materials Supp. Def.'s Mot. Summ. J., Vol. II, Tab Q, DX 12.) One of the objectives was to meet or exceed the department's 2003 fund-raising budget of $318,640.00. (Id.) SOS says she had raised only $11,000.00 by the end of April 2003, (Def.'s LR 56.1(a) Stmt. ¶ 42), an assertion that Elstad disputes. (See Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 42.)

On April 22, 2003, West issued Elstad a supervisory memo, an informal step preceding formal disciplinary action, in which he counseled her to improve her professional interactions with her peers. (Id. ¶ 47; Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 180.) West says the memo was prompted by complaints from Barclay, Dina Tsourdinis, Director of Finance, and Dawn Mueller, Human Resources Manager, that Elstad treated them like subordinates rather than peers. (Def.'s LR 56.1(a) Stmt. ¶ 47.) The memo advised Elstad that her failure to improve immediately would lead to formal disciplinary action. (Id.)

Plaintiff Ryan worked at SOS' Lockport office as West's executive assistant from February 11, 2002 until her termination on May 21, 2003. (Id. ¶¶ 51-52.) One of Ryan's responsibilities was to support the SOS board of directors. (Id. ¶¶ 52-53.)

On March 18, 2003, West rated Ryan as "meets expectation" for "preparing Board meeting packets in a timely fashion" and "provid[ing] general set-up of Board meetings." (Pls.' LR 56.1(b)(3)(B) ¶¶ 169, 171.) West rated Ryan as "above expectation" for "prepar[ing] Board meeting agendas as directed by the Board President." (*Id.*) Following the evaluation, West gave Ryan a 7.5 percent pay raise, the highest percentage raise given to any SOS employee that year. (*Id.* ¶ 172.)

In early 2003, Skender directed Ryan to facilitate two board members' interviews of staff in connection with employee satisfaction surveys. (Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 54.) On April 14, 2003, Tsourdinis claims she saw Ryan have a heated argument with Mueller about the focus group meetings to be held in connection with the surveys. (Def.'s LR 56.1(a) Stmt. ¶¶ 58-59.) Ryan denies that she behaved inappropriately. (Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 59.)

Plaintiff Sylvester worked at SOS as a Clinical Therapist from May 21, 2001 to May 21, 2003. (Def.'s LR 56.1(a) Stmt. ¶¶ 64-65.) She reported to Barclay. (*Id.* ¶ 64.) Sylvester was generally responsible for providing assessments, interventions and psycho-social-educational services for SOS children and families. (*Id.* ¶ 65.)

In August 2002, two female clients told Sylvester that three male clients had threatened to rape them. (*Id.* ¶ 67.) Sylvester prepared a memorandum about those allegations and a variety of others concerning various male SOS clients and sent it to the Lockport Police Department. (*Id.*) The Lockport police conducted interviews of the male clients, but no charges were brought against them. (*Id.* ¶¶ 75, 83.)

Ultimately, Sylvester's memo came to the attention of DCFS, which contacted West about it. (*Id.* ¶¶ 74, 76.) Though West's name appears in the carbon copy section of Sylvester's

memo, he claims he did not know that Sylvester had contacted the police until DCFS called him. (*Id.* ¶ 76.)

On August 15, 2002, West sent a letter to DCFS saying that the allegations in Sylvester's memo had ben investigated and all of them had been addressed or had been found to be insufficiently supported, assertions that Sylvester disputes. (Materials Supp. Def.'s Mot. Summ. J., Vol. II, Tab Q, DX 17; Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 79.)

In March 2003, Barclay gave Sylvester a positive performance evaluation. (Pls.' LR 56.1(b)(3)(B) ¶¶ 173-74.)

Sometime before May 5, 2003, Barclay met with SOS board member Davie Williams to discuss his growing dissatisfaction with the agency and West's behavior. (Def.'s LR 56.1(a) Stmt. ¶ 85.) Williams suggested that staff members with concerns write letters to the board. (*Id.* ¶ 87.)

On May 2, 2003, Ryan, Elstad, Sylvester, Barclay, Leslie Capra and Nicole Love prepared a letter to the SOS board expressing their complaints against West. (*Id.* ¶ 88.) All six of their names appeared on the May 5 letter, and all of them contributed to it. (*Id.* ¶ 90.) The letter contains a laundry list of complaints about West. (*See* Materials Supp. Def.'s Mot. Summ. J., Vol. III, Tab R, PX 25.) Among other things, it says that: (1) there is "[a] hostile, intimidating work environment" at SOS, (*id.*); (2) West refers to female staff members as "bitches" (*id.*); (3) West responded to a report that Capra had been groped by a male client by saying: "I knew there would be problems with hiring a young, cute blonde. She should toughen up." (*id.*); (4) West was "disrespectful" of Elstad in a meeting with their colleagues (*id.*); (5) West falsely denied to DCFS, the board and others that he knew about or approved Sylvester's August 2002 decision to contact the police about certain SOS' male clients (*id.*); and (6) West

did not conduct a thorough investigation into the allegations in Sylvester's August 2002 memo (*id.*).

On May 5, 2003, Skender received the five-page, single-spaced letter that the six staff members had prepared. (Def.'s LR 56.1(a) Stmt. ¶ 89.) Skender faxed copies of the letter to the members of the board's executive committee and, the next day, the committee had a conference call to discuss it. (*Id.* ¶¶ 96, 98.) During the call, the committee decided to have SOS consultant Gordon Johnson conduct an investigation into the allegations in the letter. (*Id.* ¶ 98.) Skender asked Johnson to have the individuals whose names appeared on the letter sign the portions about which they had knowledge. (*Id.* ¶ 106.)

Three days after Skender received the letter, Ryan sent an e-mail to him questioning certain instructions West had given her. (Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 132.) Ryan said West told her to send certain materials to the board members by mail on Thursday, May 8 or Friday, May 9, and to Federal Express other materials on Monday, May 12, in preparation for the May 14 board meeting. (*Id.*) She asked Skender if she could send everything out on Monday to save on postage. (*Id.*) Skender told her to do what West had asked her to do. (*Id.*)

Ryan took the first portion of the board packet to the post office sometime after 10:00 p.m. on Friday, May 9, 2003. (Materials Supp. Def.'s Mot. Summ. J., Vol. III, Tab R, PX 13.) Ryan did not send the second portion of the board packets out on Monday, May 12 because of copier problems. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 211.) Because the information did not go out as planned, Ryan e-mailed and faxed it to all twenty-two board members on Tuesday, May 13. (*Id.* ¶ 212.)

On May 12 and 13, 2003, Johnson conducted interviews with fourteen SOS staff members, including the six people whose names appeared on the May 5 letter and West. (Pls.'

LR 56.1(b)(3)(A) Stmt. ¶ 107.) Four of the six authors of the letter – Elstad, Ryan, Sylvester and Love – signed the letter and initialed the allegations about which they had personal knowledge. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 201; Materials Supp. Def.'s Mot. Summ. J., Vol. III, Tab R, PX 25.) The vast majority of the allegations are initialed by Elstad and Ryan. (Materials Supp. Def.'s Mot. Summ. J., Vol. III, Tab R, PX 25.)

On the morning of May 14, 2003, Skender sent an e-mail to West complaining about Ryan's preparation for the board meeting. (Def.'s LR 56.1(a) Stmt. ¶ 136.) Shortly thereafter, West sent a supervisory memo to Ryan. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 206.) The memo admonished her for her behavior toward Mueller concerning the survey focus groups, an incident that allegedly occurred more than a month earlier. (*Id.*)

At the May 14 board meeting, board member Mark Roth gave an oral report to his colleagues about Johnson's investigation into the May 5 letter. (Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 115.) Roth said that the letter was highly critical of West and made defamatory statements about him. (Materials Supp. Def.'s Mot. Summ. J., Vol. III, Tab R, PX 118.) Roth said, incorrectly, that only two of the authors were willing to sign the letter and that some of the charges in it were untrue. (*Id.*) He also said that two of the individuals whose names were on the letter had been "on the bubble" in terms of their continued employment, and that the letter could be seen as an effort to strike at West before he terminated them. (*Id.*)

After discussing the letter and West's job performance, the Board decided that it would work with West to improve his management style and would give him the chance to build his own team. (Def.'s LR 56.1(a) Stmt. ¶ 119.) The board said that Elstad and Ryan might be disruptive to the team building process. (*Id.*)

After the May 14 board meeting, Ryan sent another letter to Skender. (Materials Supp. Def.'s Mot. Summ. J., Vol. III, Tab R, PX 74.) In the letter, Ryan criticized the board's response to the May 5 letter, saying: "You kept this man in an organization whose staff provided you with SIX pages of factual information. He should have been immediately . . . put on administrative leave until the investigation was over." (*Id.*) She also said that SOS "should be ashamed of how [Elstad] was treated" at the meeting and that Ryan was "embarrassed to be a part of SOS." (*Id.*) Ryan closes the letter by saying: "In the future, I would expect you [to] treat me with a little more professionalism and respect." (*Id.*)

On May 20, 2003, Ryan sent Skender a memo responding to his complaint about her preparation for the May 14 board meeting. (Def.'s LR 56.1(a) Stmt. ¶ 140.) The letter explains why she did not mail and Federal Express the board documents as instructed. (*See* Materials Supp. Def.'s Mot. Summ. J., Vol. II, Tab Q, DX 27.) Ryan closes the letter by saying: "I am highly suspect as to the reasons why suddenly my job performance is questioned when in fact I just received a glowing performance evaluation from my supervisor. . . . I truly hope this is not a form of retaliation against me as an employee for the reasons the Board President is aware of." (*Id.*)

The same day, Skender asked Mueller to put in Ryan's personnel file his May 14, 2003 e-mail complaining about her preparation for the board meeting. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 226.)

On the evening of May 20, Johnson met with Skender, Roth and West. (Def.'s LR 56.1(a) Stmt. ¶¶ 125-26.) Though the parties dispute whether a final decision was made, there is no dispute that the notion of terminating Elstad and Ryan was discussed at the meeting. (Pls.'

8

LR 56.1(b)(3)(B) Stmt. ¶ 227; Def.'s Resp. Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 227.) Sylvester's name also came up, and the group decided to let West determine whether she should be terminated based, in part, on her reaction to the terminations of Ryan and Elstad. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 23-31.) There was no discussion about terminating Barclay, Capra or Love, the three other authors of the letter. (Def.'s LR 56.1(a) Stmt. ¶ 126.)

On May 21, 2003, West terminated Elstad because she had been unable to establish a good working relationship with the board and her peers and had failed to meet her fund-raising goals. (Materials Supp. Def.'s Mot. Summ. J., Vol III., Tab R, PX 6). The same day, West terminated Ryan for "her continued insubordinate conduct in sending Skender her May 20th memorandum." (Def.'s LR 56.1(a) Stmt. ¶ 141.)

After West announced Ryan and Elstad's terminations to the SOS staff, Sylvester asked to speak with him privately. (Id. ¶¶ 144-45.) West contends that Sylvester became highly agitated and yelled at him, a charge that Sylvester denies. (Id. ¶ 151; Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 151.) Shortly thereafter, West terminated Sylvester, telling her that he did not like the way she had talked to him. (Def.'s LR 56.1(a) Stmt. ¶ 152.)

The three other authors of the May 5 letter, Barclay and Capra, who helped compose it but did not sign it during Johnson's investigation, and Love, who both composed and signed the letter, were not fired. (Id. ¶¶ 100-02.)

## Discussion

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." FED. R. CIV. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

## Federal Claims

In Count I, plaintiffs allege that SOS violated Title VII by firing them in retaliation for their complaints of gender discrimination in the May 5 letter. Plaintiffs may use either the direct or indirect method of proof to defeat defendant's motion on these claims. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). "Under the direct method, the plaintiff must present direct evidence of (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two." *Id.* There is no dispute that plaintiffs' terminations constitute adverse employment actions. SOS contends, however, that evidence of the first and third elements is lacking.

In SOS' view, the May 5 letter does not constitute protected activity because it is not really a complaint about gender discrimination. Rather, SOS says, the letter is a complaint about West's poor treatment of all staff members, both male and female.

The Court disagrees. Though the letter accuses West of a variety of improper behavior, his purportedly discriminatory treatment of women is among the conduct decried. In relevant part, the letter says that: (1) plaintiffs "are taking a stand against th[e] hostile, intimidating work environment" at SOS, (Materials Supp. Def.'s Mot. Summ. J., Vol. III, Tab R, PX 25); (2) West

10

refers to various female staff members as "bitches" (*id.*); (3) West responded to Elstad's report that Capra had been groped by a male client by saying: "I knew there would be problems with hiring a young, cute blonde. She should toughen up." (*id.*); and (4) West was "disrespectful" of Elstad in a meeting with their colleagues from other SOS agencies (*id.*). These complaints may not state a viable claim for hostile work environment sexual harassment, but a complaint need not be legally actionable to constitute protected activity. *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1457 (7th Cir. 1994) ("[O]ur cases hold that an employee may engage in statutorily protected expression under section 2000e-3(a) even if the challenged practice does not actually violate Title VII.") Rather, "it is sufficient if the plaintiff has a reasonable belief that she is challenging conduct [that violates] Title VII." *Id.* at 1458 (internal quotation and citation omitted). Because the record does not suggest that plaintiffs' allegations about West were "utterly baseless," the Court finds that the May 5 letter is statutorily-protected activity. *Id.* (internal quotation and citation omitted); *see Firestine v. Parkview Health Sys.*, 388 F.3d 229, 234 (7th Cir. 2004) ("Only a groundless claim resting on facts that no reasonable person possibly could have construed as a case of discrimination could not constitute a statutorily protected activity.") (internal quotation and citation omitted).

The remaining question is whether there is a causal link between the May 5 letter and plaintiffs' terminations. Plaintiffs have no direct evidence of retaliatory motive. *See Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997) ("In this circuit, 'direct evidence' is defined as evidence which if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption.") (internal quotation and citation omitted). But they say such motivation can be inferred from a variety of circumstantial evidence. The Court will address the evidence relevant to each plaintiff in turn.

11

**Elstad**

Elstad says that SOS' retaliatory motive for her termination can be inferred from the following facts: (1) she was terminated on the heels of the May 5 letter (Pls.' LR 56.1(b)(3)(A) Stmt. ¶¶ 5, 89-90, 127); (2) Roth told the rest of the SOS board that the letter was signed by only two employees and some of its allegations were untrue (Materials Supp. Def.'s Mot. Summ. J., Vol. III, Tab R, PX 118); (3) SOS' witnesses gave conflicting testimony about who decided to terminate her (Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 126; Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 229); (4) SOS did not follow its progressive discipline policy before terminating her (Def.'s Resp. Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 175, 177-78, 232); (5) SOS created a budget document after the fact to justify her termination (Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 42); (6) SOS allegedly terminated her for poor fund-raising efforts, but West praised her fund-raising in a performance evaluation he completed for her four months before her termination (Def.'s Resp. Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 162-68); (7) the board spoke favorably about her fund-raising efforts at its December 2002 and January 2003 meetings (*see* Materials Supp. Def.'s Mot. Summ. J., Vol. III, Tab R, PX 44 & 45 (stating that SOS' 2002 deficit was less than its 2001 deficit due, in part, to Elstad's fund-raising efforts); and (8) SOS' failure to replace Elstad for more than six months, despite its claim that fund-raising was critical to its operations (Def.'s Resp. Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 237).

Roth's allegedly false report to the board about the May 5 letter is not probative of SOS' intent. Though the record establishes that Roth told the board, incorrectly, that only two employees had signed the letter, *see* Materials Supp. Def.'s Mot. Summ. J., Vol III, Tab R, PX 118, it does not suggest that he identified those employees in any way. Similarly, it is undisputed that Roth said some of the allegations were false, *see id.*, but there is no evidence that he identified the allegedly false charges. Absent facts that suggest Roth identified Elstad as one

12

of the letter's signatories or the source of the false charges, his statements to the board do not support an inference of retaliation.

The fact that there is conflicting testimony about who decided to terminate Elstad also does not help her case. Though it is not clear who made the final decision to terminate Elstad, there is no dispute that West, Skender and Roth were all involved in the discussions that led to the decision. (Def.'s LR 56.1(a) Stmt. ¶ 126; Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 126.) Moreover, viewed favorably to Elstad, the record suggests that all three men knew she had some involvement with the May 5 letter. (Pls.' LR 56.1(b)(3)(A) Stmt. ¶¶ 103, 121.) Those facts provide some support for an inference of retaliation. But that inference is not strengthened by SOS' inability to identify the decision maker by name.

The fact that SOS did not follow its progressive discipline policy before terminating Elstad also has little probative value. Though SOS' policy describes four levels of discipline – verbal warning, written warning, suspension/probation and termination – it also says that "[a]ny of the . . . steps in the discipline process may be omitted." (App. Pls.' LR 56.1(b) Stmt., Vol. II, Tab U, PX 65 at 28.) Absent evidence that suggests SOS rarely or never deviated from the four-step disciplinary regime, the fact that SOS did so in this instance provides little support for Elstad's claim.

What we are left with, then, is the temporal proximity between the May 5 letter and Elstad's termination, SOS' alleged creation of a document after the fact to justify her termination, West's good performance evaluation of Elstad four months before her termination, the board's praise of her fund-raising efforts in December 2002 and January 2003 and SOS' failure to replace her for more than six months, despite its claim that the essential function of her position was critical to its operations. Taken together, these facts are sufficient to raise a

genuine issue of fact as to whether there is a causal relationship between Elstad's involvement with the May 5 letter and her termination.

**Ryan**

Ryan relies on many of the same facts as Elstad to support her retaliatory discharge claim, including: (1) the short time lapse between the May 5 letter and her May 21 termination (Pls.' LR 56.1(b)(3)(A) Stmt. ¶¶ 6, 89-90); (2) Roth's incorrect report to the Board about the May 5 letter (Materials Supp. Def.'s Mot. Summ. J., Vol. III, Tab R, PX 118); (3) SOS' inability to identify the ultimate decision maker (Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 126; Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 229); (4) SOS' failure to follow its progressive discipline policy before terminating her (Def.'s Resp. Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 175, 177-78, 233); (5) the pay raise and complimentary evaluation she received two months before her termination (Def.'s Resp. Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 169-72); (6) West's issuance of a disciplinary memorandum to her on May 14, 2003, concerning an alleged incident that occurred a month earlier (Pls.' LR 56.1(b)(3)(A) Stmt. ¶¶ 58-60); (7) Skender's request that his May 14, 2003 e-mail complaining about Ryan's preparation for the board meeting be put in her personnel file the day before she was terminated (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 226); and (8) the dearth of evidence supporting the stated reason for her termination: her pattern of insubordination. (*Id.* ¶¶ 207-13).

For the reasons discussed above, Roth's allegedly incorrect report to the Board, SOS' inability to identify the decision maker and its failure to follow the progressive discipline policy are not probative of SOS' intent in terminating Ryan.

The Court agrees, however, that the record does not reveal a pattern of insubordination. SOS defines insubordination as: "[A] refusal to carry out the duties of one's assigned position; refusal to follow agency policies or procedures; refusal to comply with the directives of the immediate supervisor." (App. Pls.' LR 56.1(b) Stmt., Vol. II, Tab U, PX 65 at 29-30.) Certainly, Ryan's May 14 letter to Skender, which criticized the board's response to the May 5 letter, *see id.*, Tab U, PX 74, and her May 20 memo to Skender, which accused SOS of "inappropriate and unacceptable behavior" and retaliation, *see* Materials Supp. Def.'s Mot. Summ. J., Vol. II, Tab Q, DX 27, attack the integrity of Skender and West. But such attacks do not fall within SOS' definition of insubordination. (App. Pls.' LR 56.1(b) Stmt., Vol. II, Tab U, PX 65 at 29-30.)

Still, there is some evidence that Ryan was insubordinate, as SOS defines it. Ryan admits that she sought Skender's permission to disregard West's instructions about mailing out materials to the board members for the May 14, 2003 board meeting. (Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 132.) She also admits that Skender told her to follow West's instructions and that she did not do so. (*See* Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 209, 211 (stating that West told Ryan to mail the first part of the board meeting packets Thursday, May 8, 2003 or Friday, May 9, 2003, and to send the second part to the board members via Federal Express on Monday, May 12, 2003); Materials Supp. Def.'s Mot. Summ. J., Vol. III, Tab R, PX 16 (stating that Ryan did not take the first part of the packets to the post office until after 10:00 p.m. on Friday and did not send the second portion out on Monday because of photocopier problems).) Accordingly, there is no dispute that she failed to carry out West's instructions, even after Skender told her to do so.

Thus, the mosaic of circumstantial evidence for Ryan consists of the suspicious timing of her termination, the lack of substantiation of some for the alleged incidents of insubordination,

the pay raise and complimentary evaluation she received two months before her termination and West's issuance of a disciplinary memorandum to her on May 14, 2003, concerning an alleged incident that occurred the previous month earlier and Skender's request that his May 14, 2003 e-mail complaining about Ryan's preparation for the board meeting be put in her personnel file the day before she was terminated. Taken together, these facts are sufficient to raise a genuine issue of fact as to whether there is a causal relationship between Ryan's involvement with the May 5 letter and her termination.

**Sylvester**

To support her retaliation claim, Sylvester relies on Roth's allegedly incorrect report to the Board about the May 5 letter and SOS' failure to follow its progressive discipline policy before terminating her (Pls.' LR 56.1(b)(3)(A) Stmt. ¶¶ 7, 89-90, 126; Materials Supp. Def.'s Mot. Summ. J., Vol. III, Tab R, PX 118; Def.'s Resp. Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 175, 177-78, 234), neither of which, we have noted, is availing. In addition, she offers the short time lapse between the May 5 letter and her termination, the positive performance evaluation she received in March 2003, West's failure to consult Barclay, her immediate supervisor, before firing her and the lack of evidence supporting SOS' reason for terminating her. (*See* Pls.' LR 56.1(b)(3)(A) Stmt. ¶¶ 144-51; Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 173-74, 235.)

West's failure to consult Barclay does not help her case. According to the SOS discipline policy, "the Chief Executive Officer [West] has the sole authority to terminate the employment of any employee of SOS." (App. Pls.' LR 56.1(b) Stmt., Vol. II, Tab U, PX 65 at 29.) The policy permits, but does not require, West to take termination recommendations from lower-

level supervisors, and it does not require him to consult with those supervisors before effecting a termination. (*Id.*) Absent evidence that West customarily consulted an employee's immediate supervisor before terminating her, his failure to do so in this instance proves nothing.

Sylvester's performance evaluation is also not helpful. Sylvester was not terminated for poor performance. Rather, SOS says West fired her because of her conduct towards him in their May 14 meeting. (Def.'s LR 56.1(a) Stmt. ¶¶ 144-52.) Thus, the fact that West believed in March 2003 that she was performing her job satisfactorily has no bearing on whether she behaved improperly in a meeting two months later.

Moreover, Sylvester's account of her meeting with West does not leave her behavior above reproach. Though she says she did not yell at West, (Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 151), Sylvester admits that she: (1) asked him "[w]hat guarantee [she had] that [he would] stop talking about [her] in a profane, defamatory and untrue manner" (*id.* ¶ 145); (2) accused him of threatening her (*id.* ¶ 147); and (3) refused to leave his office when he told her to do so (*id.* ¶¶ 148-49). Thus, even if Sylvester did not raise her voice, her comments suggest an intent to provoke West rather than to engage him in a civil discussion.

In the end, the only evidence Sylvester has to suggest retaliation is the proximity of her termination to the May 5 letter. But temporal proximity, alone, is insufficient to raise a genuine issue of material fact under the direct method of proving retaliation. *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

All is not lost for Sylvester, however. She can still defeat SOS' motion on this claim if she complies with the indirect method of proof. To do so, she must first make a *prima facie* case by showing that: (1) she engaged in a protected activity; (2) she was meeting SOS' legitimate

17

expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in protected activity. *Sitar*, 344 at 728 (7th Cir. 2003). If Sylvester makes a *prima facie* case, the burden shifts to SOS to articulate a legitimate, nondiscriminatory reason for her termination. *Id.* If it does so, Sylvester must offer evidence that suggests the proffered reason is merely a pretext for retaliation. *Id.*

As stated above, Sylvester satisfies the first and third elements of the *prima facie* case. Proof of the fourth element, however, is lacking. Brian Barclay is the person who did not engage in protected activity to whom Sylvester compares herself. Though Barclay was one of the authors of the May 5 letter, he did not sign it or initial any of its allegations during Johnson's investigation. (*See* Materials Supp. Def.'s Mot. Summ. J., Vol. III, Tab R, PX 25.) Thus, Sylvester says, Barclay should be deemed not to have complained.

Even if that is true, an issue we do not decide, Barclay is not situated similarly to Sylvester. Two employees are similarly situated, if they "dealt with the same supervisor, were subject to the same workplace rules, and engaged in similar conduct, but nonetheless received disparate treatment for no apparent legitimate reason." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003). Sylvester and Barclay are different in a critical respect: they were on different levels in the organization's hierarchy. Sylvester was a clinical therapist supervised by Barclay. (Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 64.) Barclay was the Director of the Lockport Village, supervised by West. (*Id.* ¶ 9.) Barclay's status as a Sylvester's manager precludes him from being situated similarly to her. *See Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1042-43 (7th Cir. 1994) (superior is not similarly situated to subordinate).

Sylvester's claim that she was terminated because of her gender fails for the same reason. To make a *prima facie* case on this claim, Sylvester must offer evidence that, among other

18

things, a similarly situated male received more favorable treatment. *See Samuelson v. Durkee/French/Airwick*, 976 F.2d 1111, 1113 (7th Cir. 1992) (setting forth elements of *prima facie* case of gender discrimination). Because Barclay, the only male employee about whom Sylvester offers evidence, is not situated similarly to her, she cannot make a *prima facie* case of gender discrimination.

In sum, Sylvester has not raised a genuine issue of material fact on whether SOS terminated her in retaliation for her involvement with the May 5 letter or because of her gender. SOS' motion for summary judgment on those claims is, therefore, granted.


## State Law Retaliatory Discharge

In Count II, plaintiffs allege state-law retaliatory discharge claims. "A valid claim for retaliatory discharge requires a showing that an employee has been (1) discharged; (2) in retaliation for the employee's activities; and (3) that the discharge violates a clear mandate of public policy." *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 728, (Ill. 1992). All of the plaintiffs satisfy the first element and, for the reasons discussed above, Elstad and Ryan have raised a triable fact issue on whether they were discharged in retaliation for the May 5 letter.

Elstad and Ryan say that they also satisfy the third element because the letter charges West with having violated Illinois' public policy as expressed in the Abused and Neglected Child Reporting Act, 325 ILL. COMP. STAT. 5/1, *et seq.*, ("the Reporting Act"). Among other things, that statute requires employees of agencies like SOS who have "reasonable cause to believe a child known to them in their professional or official capacity may be an abused child or a neglected child [to] immediately report or cause a report to be made to [DCFS]. 325 ILL.

COMP. STAT. 5/4. But the May 5 letter does not accuse West of violating that duty. Rather, the letter says that no abuse had yet occurred and the report of two male clients' threats to assault two female clients "mistakenly ended up with DCFS." (*See* Materials Supp. Def.'s Mot. Summ. J., Vol. III, Tab R, PX 25.)

According to Sylvester, the fact that West did not violate an express provision of the Reporting Act is of no moment. It is enough, she says, that his failure to conduct a thorough investigation into the allegations she reported violated the State's policy of protecting children from abuse, the underlying goal of the Act.

The Court disagrees. In the context of retaliatory discharge, public policy is that which is "found in the State's constitution and statutes [and] . . . judicial decisions." *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 878 (Ill. 1981). Plaintiffs have not identified any common law, constitutional provision or statute that mandates criteria for investigating threats of child abuse or otherwise requires West to do something other than what he did.

Moreover, even if the State's general interest in protecting children from abuse could be the basis for a retaliatory discharge claim, an issue we do not decide, the result would be the same. Plaintiffs do not contend that West should have reported the alleged threats against the female clients to DCFS or any other authority or that his conduct, or lack thereof, resulted in any child being harmed. Because plaintiffs have no evidence to suggest that West's behavior even implicated the State's interest, they would not have viable claims for retaliatory discharge even if they were fired for reporting it.

20

## Conclusion

For reasons stated above, there is no genuine issue of material fact, and SOS is entitled to a judgment as a matter of law, on: (1) the Title VII claims Sylvester asserts in Count I for retaliation and gender discrimination; and (2) the state-law retaliatory discharge claims asserted by all plaintiffs in Count II. SOS' motion for summary judgment [doc. no. 18] is, therefore, granted as to those claims but denied as to the Title VII retaliation claims Elstad and Ryan assert in Count I, which are the only claims that remain in this suit.

**SO ORDERED.**                    ENTERED: 9/16/05

**HON. RONALD A. GUZMAN**
**United States District Judge**